UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
Eastern Division

| | |
|---|---|
| JOE WISSMAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:22-cv-669 |
| ) | |
| PROCTOR & GAMBLE ) | Jury Trial Demanded |
| PAPER PRODUCTS COMPANY, ) | |
| ) | |
| Defendant. ) | |

**COMPLAINT FOR DAMAGES**
**ALLEGING VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT, THE MISSOURI HUMAN RIGHTS ACT, AND EMPLOYER RETALIATION**

Plaintiff Joe Wissman, for his complaint against defendant Procter & Gamble Paper Products Company, states:

1. Wissman is a citizen of the State of Missouri who resides in the City of Jackson, Cape Girardeau County, Missouri.

2. Procter & Gamble Paper Products Company ("P&G") is a non-Missouri corporation with its principal place of business in the State of Ohio. P&G is registered to do business in the State of Missouri. P&G's registered agent is CT Corporation System, 120 South Central Avenue, Clayton, MO 63105.

3. This court has original jurisdiction of this case, which is a civil action arising under the laws of the United States, pursuant to 28 U.S.C. § 1331.

1

4. Venue is proper in the Eastern District of Missouri under 28 U.S.C. § 1391 in that a substantial part of the events giving rise to the claim took place in Cape Girardeau County, Missouri, which is located within this district.

5. P&G does business throughout the Eastern District of Missouri. Its principal place of business is in Ohio and there is no site within the Eastern District of Missouri that can be deemed P&G's principal place of business. Thus divisional venue is proper in any division of this district where P&G may be found, including the Eastern Division, where P&G engages in business and maintains its registered agent office. E.D. Mo. Local Rule 2.07(B)(4).

6. P&G owns and operates a large paper products manufacturing facility in Cape Girardeau County, Missouri (the "Cape Girardeau plant").

7. Wissman was employed by P&G at the Cape Girardeau plant.

8. Wissman was first employed by P&G at the Cape Girardeau plant in March 1998.

9. Wissman suffers from posttraumatic stress disorder ("PTSD"), social anxiety disorder, and occasional mood disturbances. These three conditions are referred to herein jointly as "Emotional Disabilities." Wissman's Emotional Disabilities are longstanding conditions going back to childhood traumas.

10. P&G was well aware of Wissman's Emotional Disabilities and offered him mental health services through P&G's Employment Assistance Program.

11. Wissman's Emotional Disabilities are mental impairments that substantially limit one or more of his major life activities. For example, Wissman's social

2

anxiety disorder makes it generally impossible for Wissman to eat a meal or use the restroom in the presence of others. More generally, Wissman's social anxiety disorder prevents Wissman to have normal social interactions with other persons outside of tightly constrained circumstances.

12. Wissman and his medical care provider requested on multiple occasions that P&G accommodate his social anxiety disorder by allowing him to use a private room with a microwave for his meal breaks and by allowing him to use one of the lockable private restrooms available to some personnel for his restroom breaks.

13. P&G never accommodated Wissman's Emotional Disabilities by allowing him to use a private room with a microwave for his meal breaks, instead requiring him to use a large common room shared by dozens of other employees. As a result, Wissman could not and did not take any meal breaks during his 12-hour work shift when working weekdays. This caused Wissman severe discomfort on occasion and was damaging to his health.

14. P&G never accommodated Wissman's Emotional Disabilities by allowing him to use a lockable private restroom for his restroom breaks, instead requiring him to use a common restroom that could be used by several employees at the same time. As a result, Wissman could not and did not take any restroom breaks during his 12-hour work shift when working weekdays. This caused Wissman severe discomfort on occasion and was damaging to his health. Wissman's inability to take restroom breaks when working weekdays resulted in him suffering urinary tract infections.

15. One time, P&G offered to accommodate Wissman's Emotional Disabilities by allowing him to use a room reserved for lactating mothers for his restroom breaks. Within a few days of offering Wissman the ability to use this lactation room, P&G demolished the room as part of its ongoing work at the Cape Girardeau plant. P&G never offered Wissman any alternative to the demolished lactating mothers room for his use as a restroom.

16. Wissman also requested that P&G accommodate his social anxiety disorder by allowing him to work just during night shifts and weekend shifts, which were less crowded, and by allowing him to use a handicapped entrance to the plant, which was far less trafficked than the regular plant entrance. P&G would not accommodate Wissman with either requested accommodation.

17. Wissman's PTSD had its roots in his family of origin, where he was brutalized by a large, aggressive father and, later, a large, aggressive stepfather. As a result, Wissman's PTSD is triggered by exposure to aggressive people with authority over Wissman.

18. The managers under whom Wissman worked at the Cape Girardeau plant included aggressive people with authority over Wissman. Exposure to and interaction with these managers when the managers were loud or appeared aggressive or angry, would generally trigger Wissman's PTSD, setting into motion an exacerbation of his social anxiety disorder and mood disturbances.

19. The managers under whom Wissman worked at the Cape Girardeau plant tended to work exclusively during the day shift on weekdays.

20. As a result of the foregoing, it became evident to Wissman and his mental health care providers that his PTSD could be accommodated at work by allowing him to work exclusively during the night shifts and weekends, thus avoiding the weekday day shifts and contact with the PTSD-triggering managers.

21. For many years, P&G partially accommodated Wissman's PTSD by allowing him to work night shifts only. P&G headquarters in Cincinnati, Ohio came up with the solution years ago. Although P&G policy generally required employees in Wissman's job description to swing between day and night shifts, P&G allowed Wissman to trade his day-shift assignments with other employees' night-shift assignments, thus allowing Wissman to avoid working the day shift (and satisfying the other employees' desire to avoid the night shift).

22. At that time, P&G headquarters also recommended Wissman use Family Medical Leave Act ("FMLA") unpaid leave to avoid day-shift assignments.

23. In later years, P&G rarely allowed employees in Wissman's job description from trading shifts with other workers, notwithstanding that there were other P&G employees willing to trade shifts with Wissman and notwithstanding that P&G allowed other employees to trade shifts for family events like graduations and weddings. Although P&G stopped allowing Wissman to trade shifts, P&G continued to allow Wissman to use FMLA unpaid leave to avoid working weekday day shifts.

24. Wissman also used his vacation days to avoid working weekday day shifts.

25. Wissman had surgery to correct a medical condition. While recovering from his surgery, P&G applied Wissman's FMLA leave in such a manner as to leave

5

him without any FMLA leave to use to avoid working weekday days shifts. As of May 10, 2021, Wissman had exhausted his 12-weeks of unpaid leave under the FMLA.

26. Wissman petitioned P&G to accommodate his Emotional Disabilities by allowing him to work only night shifts and on weekends, which would minimize his exposure to stressful social contexts and reduce his exposure to the managers who were likely to trigger his PTSD.

27. Specifically, Wissman requested that P&G allow him to work only night shifts and on weekends until January 2022. This would have eliminated a total of ten days of daytime weekday work. Wissman offered to use his 163 hours of accumulated paid vacation time to accomplish this. Only 120 hours of the 163 hours would have been needed to cover those ten days.

28. P&G refused to grant the accommodation.

29. On September 20, 2021, P&G terminated Wissman's employment with the company. A copy of the termination letter is attached as Exhibit 1 to this Complaint and is incorporated herein.

30. In its termination letter, P&G asserted that the "essential functions" of his job "include 12-hour rotating swing shifts (day and night shifts) with possible mandatory overtime per business needs."

31. The ability to work "rotating swing shifts" was not, in fact, an essential function of Wissman's job. It was merely a business preference of P&G.

32. The ability to work "mandatory overtime" was not, in fact, an essential function of Wissman's job. It was merely a business preference of P&G.

33. P&G has maintained a document for many years listing the "Essential Job Functions" of Wissman's position of "technician." P&G last provided Wissman with a copy of this document on or about July 19, 2021. A copy of the document provided to Wissman on or about July 19, 2021 is attached as Exhibit 2 to this Complaint and is incorporated herein. The ability to work 12-hour rotating shifts and possible mandatory overtime are not included among P&G's official essential job functions for Wissman's position.

34. The termination letter also stated that the Cape Girardeau plant "has no night shift only roles."

35. In fact, P&G's internal documents, including the document shared with Wissman on or about July 19, 2021, stated the following with respect to "Work Schedule" for Wissman's position: "12-hour rotating swing shift with possible mandatory overtime per business needs; or if needed 5 day and 4 day schedules. At times, irregular break or lunch schedule."

36. Approximately half of the technicians at the Cape Girardeau plant do not work on 12-hour rotating shifts, but work a 5 day schedule, Monday through Friday, with many working days and some working nights.

37. The termination letter claims that, "Collectively we were unable to identify a reasonable accommodation that would facilitate your return to work. As you are not able to return to work, with or without reasonable accommodations, we have proceeded with the termination of your employment with Proctor & Gamble, effective 9/20/21."

38. It was, in fact, possible for Wissman to return to work with reasonable accommodations. There were four reasonable accommodations available. The first, and simplest, was to allow Wissman to only work night shifts. The second was the practice followed for many years before a change in P&G policy: allowing Wissman to avoid day-shift work by trading shifts with other employees. The third accommodation was the accommodation that had been provided to Wissman almost up to the point of his termination: allowing him to continue to take unpaid leave when assigned to work a day shift. The fourth possible accommodation was one suggested by the P&G human resources personnel with whom Wissman met: to allow Wissman to use short-term disability to cover his time out on daytime weekday shifts, similar to P&G's practice with employees undergoing chemotherapy.

39. With respect to all four possible reasonable accommodations described in the paragraph above, the problem was not that there was no reasonable accommodation, or that the requested accommodation would interfere with Wissman performing the essential functions of his job. The problem was simply that P&G had a mere business preferences unrelated to the essential functions of Wissman's job that P&G prioritized over accommodating Wissman's Emotional Disabilities.

40. During the preceding process, Wissman filed more than one complaint about P&G's actions with the EEOC and the U.S. Department of Labor's Wage and Hour Division ("WHD").

41. P&G was unhappy with Wissman for filing his complaints with the EEOC and the WHD.

42. P&G retaliated against Wissman for filing his complaints with the EEOC and the WHD by creating bogus reasons for not accommodating Wissman's Emotional Disability, thus setting up Wissman to have his employment with P&G terminated.

43. P&G's decision to retaliate against Wissman caused or contributed to cause P&G's termination of Wissman's employment.

44. Wissman timely filed a charge of discrimination with the Missouri Human Rights Commission ("MHRC") and the Equal Employment Opportunity Commission ("EEOC"). Wissman filed an amended charge of discrimination November 15, 2021 A copy of the amended charge of discrimination is attached as Exhibit 3 to this Complaint and is incorporated herein.

45. The amended charge of discrimination detailed P&G's discriminatory activity, including P&G's refusal to accommodate Wissman's Emotional Disability by allowing him to work weekend and night-only shifts, to have access to private bathroom breaks, and to have access to a handicap entrance.

46. On March 31, 2022, the EEOC issued Wissman a right-to-sue letter, authorizing him to file suit on his discrimination charges. A copy of the right-to-sue letter is attached as Exhibit 4 to this Complaint and is incorporated herein.

**COUNT 1**
**Violation of the ADA**
**42 U.S.C. §§ 12112 and 12117(a)**

47. Wissman realleges the allegations of the preceding paragraphs of this Complaint as though set out at length again.

48. Wissman is disabled by reason of his PTSD, his social anxiety disorder, and occasional mood disturbances.

49. Wissman's disability substantially limits more than one of his major life activities, including socializing, eating, urinating, and working.

50. Wissman is qualified for the position of technician at P&G's Cape Girardeau plant. In fact, Wissman capably and satisfactorily performed the responsibilities of this position for almost 25 years.

51. Wissman suffered an adverse employment decision September 20, 2021, when P&G terminated him from his employment.

52. P&G knew of Wissman's disability, having accommodated his disability in whole or in part for many years, and having terminating his employment with a letter in which P&G acknowledged his disability and falsely stated that it could not reasonably accommodate his disability.

53. Providing Wissman with the scheduling accommodation requested would have been reasonable, would not have imposed undue hardship on P&G, and would not have preventing Wissman from performing any essential function of his position. P&G's statements to the contrary are knowingly false.

54. P&G continues to employ numerous persons in Wissman's position at its Cape Girardeau plant and continues to hire and seek to hire other persons to fill Wissman's position.

55. P&G's conduct violated the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112, which prohibits discrimination in employment on the basis of an employee's disability.

56. Wissman was thereby harmed.

57. Wissman has a private right of action to bring suit to enforce his rights under the ADA. 42 U.S.C. § 12117(a).

58. P&G's conduct as described was extreme and outrageous intentional discrimination, malicious, and in reckless disregard of Wissman's rights. Punitive damages are appropriate to punish P&G and to deter P&G and other employers from similar conduct in the future.

WHEREFORE, Joe Wissman asks that the court enter judgment in his favor and against defendant Procter & Gamble Paper Products Company for: (1) reinstatement in his position; (2) back pay for the period beginning with his termination and ending with his reinstatement; (3) accommodation of his disability by scheduling him for work only at nights and on weekends; (4) additional compensatory damages for the financial losses he suffered from having to take unpaid leave and use accrued vacation to compensate for P&G's refusal to accommodate his disability and for the inconvenience he has suffered; (5) attorney fees and the expenses of this lawsuit; and (6) punitive damages.

11

## COUNT 2
### Violation of the Missouri Human Rights Act
### Section 213.055, RSMo

59. Wissman realleges the allegations of the preceding paragraphs of this Complaint as though set out at length again.

60. Wissman is disabled.

61. Wissman was discharged from his employment.

62. Wissman's disability was a factor in his discharge.

63. P&G could have accommodated Wissman's disability rather than discharge him from employment.

64. The accommodation Wissman sought, being allowed to work nights and weekends only, was a reasonable accommodation and did not interfere with any essential functions of Wissman's job duties.

65. P&G's conduct violated the Missouri Human Rights Act, Section 213.055, RSMo,, which prohibits discrimination in employment on the basis of an employee's disability.

66. Wissman was thereby harmed.

67. P&G's conduct as described was extreme and outrageous intentional discrimination, malicious, and in reckless disregard of Wissman's rights. Punitive damages are appropriate to punish P&G and to deter P&G and other employers from similar conduct in the future.

WHEREFORE, Joe Wissman asks that the court enter judgment in his favor and against defendant Procter & Gamble Paper Products Company for: (1) reinstate-

ment in his position; (2) back pay for the period beginning with his termination and ending with his reinstatement; (3) accommodation of his disability by scheduling him for work only at nights and on weekends; (4) additional compensatory damages for the financial losses he suffered from having to take unpaid leave and use accrued vacation to compensate for P&G's refusal to accommodate his disability and for the inconvenience he has suffered; (5) attorney fees and the expenses of this lawsuit; and (6) punitive damages.

### COUNT 3
### Retaliation in Violation of the ADA
### 42 U.S.C. § 12203

68. Wissman realleges the allegations of the preceding paragraphs of this Complaint as though set out at length again.

69. The ADA prohibits an employer from discriminating against an employee because the employee has opposed any act or practice made unlawful by the ADA,

70. The ADA prohibits an employer from discriminating against an employee because the employee has made a charge under the ADA.

71. Wissman opposed P&G's practices described in this Complaint and filed several charges under the ADA because of those practices.

72. P&G discriminated against Wissman for these action by refusing to continue to accommodate his disability.

73. P&G discriminated against Wissman for these action by terminating his employment.

74. Wissman was thereby harmed.

75. Wissman has a private right of action to bring suit to enforce his rights against retaliation under the ADA. 42 U.S.C. § 12203.

76. P&G's conduct as described was extreme and outrageous intentional discrimination, malicious, and in reckless disregard of Wissman's rights. Punitive damages are appropriate to punish P&G and to deter P&G and other employers from similar conduct in the future.

WHEREFORE, Joe Wissman asks that the court enter judgment in his favor and against defendant Procter & Gamble Paper Products Company for: (1) reinstatement in his position; (2) back pay for the period beginning with his termination and ending with his reinstatement; (3) accommodation of his disability by scheduling him for work only at nights and on weekends; (4) additional compensatory damages for the financial losses he suffered from having to take unpaid leave and use accrued vacation to compensate for P&G's refusal to accommodate his disability and for the inconvenience he has suffered; (5) attorney fees and the expenses of this lawsuit; and (6) punitive damages.

## COUNT 4
### Retaliation in Violation of the Missouri Human Rights Act
### Section 213.055, RSMo

77. Wissman realleges the allegations of the preceding paragraphs of this Complaint as though set out at length again.

78. Like the ADA, the Missouri Human Rights Act also prohibits an employer from taking adverse action, such as firing, or otherwise retaliating against an employee, for filing a charge of discrimination or otherwise opposing discrimination.

14

79. P&G took adverse action and retaliated against Wissman for opposing discrimination. These actions included denying Wissman previously provided accommodations for his disability and terminating his employment.

80. Wissman was thereby harmed.

81. P&G's conduct as described was extreme and outrageous intentional discrimination, malicious, and in reckless disregard of Wissman's rights. Punitive damages are appropriate to punish P&G and to deter P&G and other employers from similar conduct in the future.

WHEREFORE, Joe Wissman asks that the court enter judgment in his favor and against defendant Procter & Gamble Paper Products Company for: (1) reinstatement in his position; (2) back pay for the period beginning with his termination and ending with his reinstatement; (3) accommodation of his disability by scheduling him for work only at nights and on weekends; (4) additional compensatory damages for the financial losses he suffered from having to take unpaid leave and use accrued vacation to compensate for P&G's refusal to accommodate his disability and for the inconvenience he has suffered; (5) attorney fees and the expenses of this lawsuit; and (6) punitive damages.

JACOBSON PRESS P.C.

By: <u>/s/ Joe D. Jacobson</u>
Joe D. Jacobson #33715
222 South Central Ave., Suite 550
Clayton, Missouri 63105
Tel: (314) 899-9789
Direct: (314) 899-9790
Fax: (314) 899-0282
Jacobson@ArchCityLawyers.com

Attorneys for plaintiff Joe Wissman